***********
Upon review of the competent evidence of record, including the briefs and oral arguments of the parties, with reference to the errors assigned and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award. *Page 2 
 *********** RULING ON DEFENDANT'S MOTION
Defendant moved, pursuant to Rules 613(c) and 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission, for an Order dismissing Plaintiff's appeal, or in the alternative, dispensing with oral arguments, on the grounds that Plaintiff failed to file his Form 44 and brief to the Full Commission in a timely manner, and failed to state with particularity his grounds for appeal. Plaintiff submitted a Form 44 and attachments thereto dated February 28, 2010. Plaintiff did not submit a written response or objection to Defendant's Motions. After consideration of the written arguments of Defendant, Defendant's Motion to Dismiss Appeal is hereby DENIED and Defendant's Motion to Dispense with Oral Arguments is hereby GRANTED.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The date of the alleged work injury which is the subject of this claim is January 30, 2008.
2. On January 30, 2008, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On January 30, 2008, an employment relationship existed between the parties.
4. On January 30, 2008, Defendant employed three or more employees. *Page 3 
5. Defendant was self-insured with North Carolina Baptist Hospital as its third-party administrator at all times relevant to these proceedings.
6. Plaintiff's average weekly wage is to be determined by a Form 22.
7. Defendant denied Plaintiff's claim.
8. Plaintiff did not return to work after January 30, 2008.
9. The parties are properly designated, and there is no question as to the joinder or the non-joinder of any party.
10. The November 3, 2008 mediation of this matter resulted in an impasse.
11. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Pre-Trial Agreement;
 b. Stipulated Exhibit Two: Plaintiff's medical records;
 c. Stipulated Exhibit Three: Plaintiff's personnel file;
 d. Stipulated Exhibit Four: North Carolina Industrial Commission forms and filings;
 e. Stipulated Exhibit Five: Discovery responses.
12. The Deputy Commissioner admitted the following documents into evidence:
 a. Plaintiff's Exhibit One: Correspondence from Mr. James R. DeLuca to Plaintiff's former counsel dated April 28, 2008;
 b. Plaintiff's Exhibit Two: Correspondence from Mr. James R. DeLuca to Plaintiff's former counsel dated April 28, 2008.
 *********** ISSUES *Page 4 
The issues to be determined are:
1. Whether Plaintiff suffered an injury by accident or specific traumatic event on January 30, 2008, and if so, to what workers' compensation benefits is he entitled?
2. If Plaintiff suffered an injury by accident or specific traumatic event, whether it is the cause of Plaintiff's current condition?
3. Whether Plaintiff is entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1?
4. If Plaintiff is entitled to workers' compensation benefits, whether Plaintiff's benefits should be suspended under either N.C. Gen. Stat. §§ 97-32 or 97-32.1?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 45 years old, with a date of birth of December 7, 1964. Plaintiff has a high school diploma and took some college courses. Defendant employed Plaintiff as a laboratory animal technician. Plaintiff's duties as a laboratory animal technician required him to provide daily care for laboratory animals, including cleaning animal cages, feeding the animals, and disposing of animal waste. *Page 5 
2. On January 30, 2008, Plaintiff was going out to feed sheep in a utility vehicle resembling a golf cart as part of his regular employment duties. Plaintiff dropped his co-worker, Mr. David Weavil, off at another building and then drove to the paddocks in order to feed sheep. Plaintiff set the emergency brake on the utility vehicle, got off of the utility vehicle, and as he was walking around in front of the gate of the paddocks, he heard a noise behind him. As Plaintiff turned around to see from where the noise was coming, he recalled something "blindsiding" him and knocking him into the gate in front of him, and then hitting him again, thereby pushing him through the gate, causing the gate to actually bend. Plaintiff then realized that the noise he heard was the utility vehicle, which rolled approximately 10 to 15 feet downhill toward him after he got off of it, and ultimately pinned him to the adjacent chain-link fence. Plaintiff pushed the utility vehicle, which he estimated to weigh between 700 and 800 pounds, off of himself and reported this incident to Mr. Weavil. Mr. Weavil did not witness this incident because he was working inside the barns at the time.
3. Initially, Plaintiff did not have any symptoms of pain or discomfort after the incident. Plaintiff's initial reaction to the incident was feeling "scared to death." Approximately 10 to 15 minutes afterwards, Plaintiff began to experience nausea and throbbing pain in his back and running down his legs.
4. Shortly after the incident, Plaintiff and Mr. Weavil rode the same utility vehicle to the main building where Plaintiff completed an incident report form. The utility vehicle drove normally and subsequent inspections indicated that it needed no repairs. After completing the incident report form and changing into street clothes at the main building, Plaintiff went via ambulance to the hospital. By the time that the ambulance arrived, Plaintiff began to experience numbness in his right leg, bilateral knee weakness, and right shoulder pain.
5. Defendant contends that Plaintiff has given inconsistent statements about how the injury occurred. In his recorded statement taken shortly after the work injury, *Page 6 
Plaintiff stated that he was on his way to feed the sheep when the incident occurred and that he immediately went to find Mr. Weavil after his injury; however, at the hearing before the Deputy Commissioner, Plaintiff could not remember whether he fed the sheep before or after his work injury. Mr. Weavil believed Plaintiff fed the sheep because the feed buckets on the utility vehicle were empty when he saw Plaintiff after the report of an injury and the sheep did not display familiar signs of being hungry.
6. At the hospital, Plaintiff underwent x-rays of his right shoulder, lumbar spine, thoracic spine, and left forearm, and received diagnoses of acute lumbar strain and acute right-sided sciatica with sensory loss. The medical records for this visit described Plaintiff's injuries as "minor" due to the "low speed rolling golf cart." Plaintiff received a note writing him out of work for one week.
7. On February 4, 2008, Plaintiff presented to Defendant's Employee Health Services, where she saw Ms. Brenda Whitaker McKinney, a physician's assistant. Ms. McKinney diagnosed Plaintiff with a minor contusion of the forearm, a back sprain/strain, and a minor sprain/strain of his right shoulder, and gave him light-duty restrictions with a 20 pound lifting limit. She also recommended physical therapy.
8. On February 5, 2008, Plaintiff began physical therapy for his lumbar strain. After this initial visit to physical therapy, Plaintiff called Employee Health Services reporting an increase in lower back pain and received a referral for an MRI. Plaintiff's MRI showed disc degeneration and a tiny central disc protrusion with a posterior annular tear. These MRI findings were substantially the same as an earlier MRI of Plaintiff. Due to these MRI results and Plaintiff's report that he had success with injections for his prior *Page 7 
back pain, Employee Health Services referred Plaintiff to Dr. Hongtao Michael Guo, a pain management specialist.
9. On February 21, 2008, Defendant filed a Form 63 and began paying Plaintiff temporary total disability compensation.
10. On February 26, 2008, Plaintiff saw Dr. Guo, who recommended a sacroiliac joint injection and possible right transforaminal epidural injection at the S1 level of the spine. The protocol for these injections involves a two-step process. If the first injection is not successful, then there would be no second injection. On February 28, 2008, Plaintiff underwent the sacroiliac joint injection which, according to Plaintiff, provided over a 50 percent reduction in pain. On March 6, 2008, Plaintiff received a right transforaminal epidural injection. Plaintiff reported to both Ms. McKinney and Dr. Guo that the March 6, 2008 transforaminal epidural injection caused him to be "so sore that he could barely move" the following day, and that he was "miserable." However, surveillance conducted on March 7, 2008 by Action Investigation recorded Plaintiff loading groceries into his truck, including a case of beverages and a large bag of dog food. Additionally, Plaintiff appeared to walk without any difficulty or limp, which was also inconsistent with his report.
11. On March 12, 2008, Plaintiff reported to Dr. Guo that his sacroiliac joint pain was better, but that he began experiencing shooting pain down his lower back. Consequently, Dr. Guo decided to change the type of injections that he was giving Plaintiff. Dr. Guo scheduled Plaintiff to undergo a new injection on March 19, 2008.
12. On March 24, 2008, Plaintiff reported to Ms. McKinney that he was doing better after the most recent injection. Plaintiff also reported that Dr. Guo told him that "he *Page 8 
would have permanent nerve damage and would never get over this and he's never had a disability." The Full Commission finds credible Dr. Guo's denial of ever making such a comment to Plaintiff.
13. On April 1, 2008, Plaintiff underwent physical therapy for his right shoulder. Thereafter, Plaintiff complained that his pain increased due to being placed on a rowing machine. On April 10, 2008, Plaintiff returned to Dr. Guo for another injection, at which time he reported that his lower back pain was improving. Dr. Guo believed that Plaintiff was doing well, and wrote him out of work until May 1, 2008.
14. On April 17, 2008, Plaintiff presented to Employee Health Services with complaints of severe pain following a physical therapy appointment for his right shoulder. Ms. McKinney canceled the remaining physical therapy appointments. Plaintiff also complained that the April 10, 2008 injection performed by Dr. Guo kept him in bed for three days. However, Dr. Guo was of the opinion that being in bed for three days after the most recent injection that he gave Plaintiff was "surprising" and "unusual" because he took precautions to reduce any pain associated with the injection. Ms. McKinney decided to schedule Plaintiff for an appointment with Dr. John Peter Birkedal, an orthopaedist, for a second opinion.
15. On April 24, 2008, Plaintiff returned to Employee Health Services complaining that the first two injections he received from Dr. Guo did not help his lower back pain and the third injection made him feel worse. Ms. McKinney noted that this was inconsistent with what Plaintiff reported to her in other visits. Plaintiff also reported that his current pain level was a three on a scale of one to 10, and that he was not working. Ms. McKinney changed Plaintiff's lifting restrictions from 20 to 25 pounds with the consent of *Page 9 
Dr. Guo. Defendant later advised Plaintiff that they would accommodate this 25 pound lifting restriction in Plaintiff's original position as a laboratory animal technician; however, Plaintiff refused to return to work. Plaintiff unjustifiably refused employment which would have been modified to accommodate his restrictions during the healing period.
16. On April 28, 2008, Defendant denied the compensability of Plaintiff's claim via a Form 61. The Form 61 stated that "[a]lthough it does appear the employee hurt his back initially, the employee's condition does not seem to be of the severity to be considered disabling. The employer has paid for employee's treatment and indemnity benefits up through the past week."
17. On April 30, 2008, Plaintiff filed a Form 18, and on May 1, 2008, filed a Form 33 request for hearing.
18. Due to Plaintiff's inconsistent comments about the results obtained from injections and his examination findings, Dr. Guo recommended a functional capacity evaluation to determine what he is capable of doing. Dr. Guo was of the opinion that Plaintiff was capable of performing light-duty work as of May 2, 2008.
19. On May 5, 2008, Plaintiff presented to Dr. Susan Borromeo Yuson, his primary care physician, with continued complaints of lower back pain. Plaintiff requested a referral to a neurosurgeon, upon the advice of his attorney. Dr. Yuson examined Plaintiff's back, but declined to refer him to a neurosurgeon since she did not have any records concerning his lower back pain.
20. On May 13, 2008, Plaintiff presented to Ms. Colleen Patricia Mahar, a physician's assistant for Dr. Max William Cohen, an orthopaedist. Plaintiff's attorney suggested that he seek treatment from Dr. Cohen. Ms. Mahar administered a steroid *Page 10 
injection in Plaintiff's right shoulder, referred him to physical therapy for his lower back pain, and issued a 15 pound lifting restriction. On June 10, 2008, Plaintiff saw Dr. Cohen, at which time he reported that his lower back was doing better with the physical therapy. Although Plaintiff had improvement in his right shoulder, Dr. Cohen was of the opinion that he would benefit from another steroid injection, which he administered to Plaintiff at this visit. On July 22, 2008, Plaintiff saw another of Dr. Cohen's physician's assistants. Plaintiff reported some improvement in his right shoulder, but continued pain, as well as burning, stabbing pain in his lower back, and numbness in his right leg and foot. Plaintiff received another steroid injection in his right shoulder, and was directed to continue physical therapy. At this final visit to Dr. Cohen's office, Plaintiff's diagnoses included right shoulder impingement, bursitis, lower back pain, degenerative disc disease at the L5-S1 level of the spine, and an annular tear.
21. Defendant retained the services of Mr. William A. Shafer and Ms. Mary Cornett, both of whom are licensed private investigators, in order to perform surveillance on Plaintiff beginning in February, 2008.
22. On August 29, 2008, approximately one month after his last visit to Dr. Cohen, surveillance videos depicted Plaintiff loading a medium-sized suitcase with his right hand into his horse trailer. Plaintiff then climbed into the bed of his truck, straightened the bed mat, and jumped off the back of the truck. Plaintiff then proceeded to crank the fifth wheel down to attach the truck to the horse trailer. Using his right hand and then changing to his left hand, Plaintiff rotated the crank approximately 53 times. Later, Plaintiff picked up a large rectangular bag labeled "All Stock," which he testified that he *Page 11 
bought in 50 pound bags. Plaintiff lifted the bag onto his right shoulder, and carried it to the other side of the horse trailer.
23. On September 5, 2008, surveillance videos depicted Plaintiff bending forward and down at the waist in order to pull weeds on his property. While Plaintiff would momentarily place his hands on his lower back, he continued to pull weeds for a prolonged period of time. Additionally, Plaintiff used a limb trimmer in order to cut branches, including some branches that required overhead movements.
24. On October 31, 2008, surveillance videos depicted Plaintiff at someone else's property assisting in constructing a roof. Plaintiff walked, bent down at the waist several times, raised three planks over his shoulders to the people on top of the roof, cut wood using a saw, held down wood while someone else nailed it, and retrieved tall beams for the people on top of the roof. Later in the same day, Plaintiff went back to his home and groomed his horse. Plaintiff retrieved two blankets from his truck, raised them to shoulder height, shook them out, and placed the blankets on the back of the horse. Plaintiff then retrieved a leather saddle from the truck and carried it to the horse using his right hand. Using both hands, Plaintiff lifted the saddle over his shoulder and onto the back of the horse, bent to adjust various straps, and secured the saddle.
25. On September 4, 2008, Plaintiff underwent a functional capacity evaluation administered by Dr. Patricia Perdue, who has a doctoral degree in physical therapy. Dr. Perdue was of the opinion that Plaintiff gave variable or sub-maximal physical effort during the functional capacity evaluation, and had several areas where he was either intentionally limiting his abilities or at least appeared to be intentionally limiting them. At the end of the testing, Plaintiff rated his pain as 10 out of 10. The results of the functional *Page 12 
capacity evaluation indicated that Plaintiff could not lift over 15 pounds from floor to knuckle and from knuckle to shoulder, carry 15 pounds over 30 feet, or lift eight pounds from shoulder to overhead, which was contrary to Plaintiff's activities shown on the surveillance videos.
26. At her deposition, Dr. Perdue reviewed footage from the surveillance videos. Dr. Perdue felt that Plaintiff's bending motions on the surveillance video taken the day after the functional capacity evaluation were different than what he did during the bending and crouching test during the functional capacity evaluation. Dr. Perdue was also of the opinion that the August 29, 2008 footage of Plaintiff lifting and carrying the large bag labeled "All Stock" was inconsistent with the restrictions of no lifting over 15 pounds and no overhead motions from the functional capacity evaluation. Further, Ms. Perdue opined that the functional capacity evaluation and the surveillance footage of Plaintiff "definitely conflict with each other, based on what the video looks like and what he was able to demonstrate to me during the test." Dr. Perdue agreed that if she knew about Plaintiff's activities on the surveillance videos when conducting the functional capacity evaluation, it would have possibly changed the result, and that the surveillance footage indicates that Plaintiff may be able to do more than what he demonstrated on the day of the testing. The Full Commission gives great weight to the opinion testimony of Dr. Perdue. Further, the Full Commission gives little weight to the results of Plaintiff's September 4, 2008 functional capacity evaluation.
27. Plaintiff has a history of lower back problems. In September 1995, Plaintiff sought medical treatment after being thrown from a horse, and during this treatment, mentioned that he had a prior back injury in 1990. In 2000, Plaintiff suffered a lumbar *Page 13 
strain in connection with a motor vehicle accident. In September 2005, Dr. Yuson diagnosed Plaintiff with lumbar back pain and right radiculopathy, and ordered an MRI, which revealed an annular tear, a mild concentric disc bulge at the L5-S1 level of the spine, and mild facet hypertrophy of the lumbar spine. At the time, Plaintiff had three jobs, including the laboratory animal technician position with Defendant, as well as bartender and farrier positions. Plaintiff was working a total of 70 to 80 hours per week.
28. On November 3, 2005, Plaintiff presented to Dr. Hans Christian Hansen, a pain management specialist, upon referral from Dr. Yuson. Dr. Hansen diagnosed Plaintiff with degenerative spinal disease of the lumbar spine and radiculopathy, and performed the first in a series of three lumbar epidural steroid injections. On December 1, 2005, Dr. Yuson released Plaintiff to return to work with no restrictions.
29. Plaintiff continued to have problems with lower back pain while working and received additional epidural steroid injections from Dr. Hansen. On February 23, 2006, Plaintiff reported improvement in his lower back complaints, but still received another epidural steroid injection.
30. On February 20, 2007, Plaintiff returned to Dr. Hansen with continued complaints of lower back pain. Dr. Hansen administered another epidural steroid injection and instructed Plaintiff to follow up with him in a month. However, Plaintiff never returned to Dr. Hansen. At his deposition, Dr. Hansen would not render an opinion concerning Plaintiff's continued lower back problems after February 2007, since Plaintiff never returned for follow up with him after that time.
31. Plaintiff did not list any prior shoulder problems when requested in discovery. However, Plaintiff's medical records reveal that he complained of shoulder pain *Page 14 
in December 1995, and right shoulder pain in 1997. At the hearing before the Deputy Commissioner, Plaintiff also disclosed that he needed left shoulder surgery in 2001. Due to a gap in Plaintiff's medical records from 1999 through 2005, his testimony concerning the need for left shoulder surgery in 2001 could not be corroborated.
32. At her deposition, Ms. McKinney reviewed footage from the surveillance videos. Ms. McKinney felt that Plaintiff's activity on March 7, 2008 of loading heavy grocery items was inconsistent with his statement to her that on the same day he was "so sore that he could barely move." Ms. McKinney was "very disturbed" at what she saw on the March 7, 2008 surveillance footage, not because Plaintiff was doing activities outside of his restrictions, but because "the presentation he made in the clinic [was] that he could hardly do anything, and then you see him out like there's nothing wrong." After reviewing the August 29, 2008 and October 31, 2008 surveillance footage, Ms. McKinney opined that Plaintiff's activities depicted therein were inconsistent with what he reported to her during her treatment of him in the spring of 2008 and the findings of the September 4, 2008 functional capacity evaluation.
33. Based upon Ms. McKinney's examination and treatment of Plaintiff, along with all of the evidence that she reviewed, Ms. McKinney was of the opinion that Plaintiff would have been able to perform the duties of the laboratory animal technician position available with Defendant in April 2008. Ms. McKinney further opined that Plaintiff's January 30, 2008 work injury, more likely than not, aggravated his pre-existing lower back condition. Ms. McKinney based her causation opinion on her examination and treatment of Plaintiff, including the history he provided about how the January 30, 2008 work injury *Page 15 
occurred. The Full Commission gives great weight to the opinion testimony of Ms. McKinney.
34. At his deposition, Dr. Guo reviewed footage from the surveillance videos, as well. After viewing the footage of Plaintiff sawing wood, moving wood planks, raising wood planks above his shoulder, carrying a saddle with his right hand, carrying a large bag of "All Stock" with his right shoulder, and cranking the mechanism to attach his trailer to his truck, Dr. Guo felt that Plaintiff "could do more in the video than what the FCE showed." After reviewing the footage depicting Plaintiff's activity on March 7, 2008 loading heavy grocery items, Dr. Guo thought that Plaintiff acted differently in the video than how he presented to him, in that Plaintiff did not have a limp or appear to have as much pain in the video as what he described to him in the office visits. Moreover, Dr. Guo was of the opinion that Plaintiff's behavior in the surveillance videos was inconsistent with the complaints he reported to him at the March 24, 2008 office visit, and that footage of Plaintiff was unusual, not because Plaintiff was violating any restrictions, but because he was acting differently in the footage than at the office visits.
35. Based upon Dr. Guo's examination and treatment of Plaintiff, along with all of the evidence that he reviewed, Dr. Guo opined and the Full Commission finds as fact that Plaintiff would have been able to work with a 25 pound lifting restriction as of April 24, 2008. Further, Dr. Guo was of the opinion and the Full Commission finds as fact that Plaintiff's January 30, 2008 work injury more likely than not at least increased or exacerbated his pre-existing lower back condition. The Full Commission gives great weight to all of the opinion testimony of Dr. Guo. *Page 16 
36. Dr. Cohen believed that the incident may have caused or aggravated Plaintiff's back pain, "[b]ut timing is the most important thing, and if he truly did not have pain before he was injured, then I would assume that that is what aggravated or activated his pain."
37. After learning about some of the surveillance evidence, Dr. Cohen was of the opinion that Plaintiff is "able to work through his pain. He's able to function fairly well despite having bursitis and lower back pain." Dr. Cohen believed that Plaintiff would be able to work, but was not sure what his restrictions would be other than generally limiting the amount of lifting, bending, and twisting to avoid aggravating his symptoms. Since Plaintiff had a history of an annular tear and degenerative disc disease since 2005, Dr. Cohen believed that he should have been on the same type of preventative restrictions before the incident.
38. Dr. Cohen believed that he would have started raising Plaintiff's restrictions in August 2008 to begin to return him to work. Dr. Cohen believed that since Plaintiff had a heavy job description, he would have probably given him around a 50 pound restriction. After being informed about Plaintiff's activities during surveillance, Dr. Cohen stated that it appeared that Plaintiff's shoulder bursitis resolved.
39. Based upon the greater weight of the evidence, Plaintiff was capable of returning to work with Defendant in his laboratory animal technician position by April 24, 2008. Plaintiff's incapacity to work resulting from his January 30, 2008 injury had ended before April 28, 2008, when Defendant filed the Form 61 denying that further benefits were owed. Since Plaintiff misrepresented his physical capabilities to his treating healthcare providers and the surveillance videos show that Plaintiff is capable of *Page 17 
performing at a higher physical demand level than he reported to his medical providers or demonstrated on the FCE, the Full Commission finds as fact that Plaintiff's disability from his January 30, 2008 injury ended on April 24, 2008.
40. Plaintiff has not made a reasonable effort to find suitable employment. Plaintiff testified that he had looked for "several jobs" but did not offer any names or dates of applications. Further, he testified that he had sent his resume to three or four online jobs, which is an insufficient effort on his part to find suitable employment.
41. Plaintiff has been collecting unemployment benefits of $288 per week from July 2008 to at least the date of the hearing.
42. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's average weekly wage is $517.55, resulting in a compensation rate of $345.21 per week.
43. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff sustained a compensable injury by accident on January 30, 2008 arising out of and in the course and scope of his employment, resulting in an injury to his right forearm and the aggravation of pre-existing back problems.
44. Based upon the greater weight of the competent evidence, including consideration of Plaintiff's activities on the surveillance videos and his misrepresentations to medical providers, Plaintiff's need for medical treatment related to his January 30, 2008 work injury ended by the time of his July 22, 2008 visit with Dr. Cohen. After Dr. Cohen's review of the surveillance videos, he was of the opinion that Plaintiff shoulder problems had resolved.
45. Defendant had reasonable grounds to defend this claim. *Page 18 
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On January 30, 2008, Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with Defendant resulting in an aggravation of his pre-existing back condition and an injury to his right shoulder. N.C. Gen. Stat. § 97-2(6) (2009).
2. Plaintiff's disability from his January 30, 2008 work injury ended April 24, 2008. Plaintiff has the burden of proving the extent of his continuing disability. N.C. Gen. Stat. § 97-2(9) (2009);Russell v. Lowes Product Distrib.,108 N.C. App. 762, 425 S.E.2d 454 (1993). Ms. McKinney and Dr. Guo released Plaintiff to return to work as of April 24, 2008 with a 25 pound lifting restriction, but Plaintiff refused to return to work. The evidence establishes that Plaintiff can work but did not make a reasonable effort to find work; that he has no factors such as age or lack of education that would make it futile to seek employment; and that Plaintiff did not return to work at a diminished wage. Thus, Plaintiff failed to meet his burden of proving continuing disability. At the most, Plaintiff is entitled to temporary total disability compensation up to April 28, 2008.Russell, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
3. Plaintiff produced sufficient, credible evidence that his lower back and right shoulder injury were caused or aggravated by his January 30, 2008 work injury. Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000). However, the medical evidence of record is insufficient to establish that Plaintiff's continuing lower back and/or *Page 19 
right shoulder complaints that he may have had after July 22, 2008 were the result of his January 30, 2008 work injury, given Plaintiff's numerous misrepresentations of his medical complaints and physical capabilities to his treating health care providers. Id.
4. As a result of Plaintiff's January 30, 2008 work injury, Plaintiff is entitled to have Defendant pay for all medical treatment reasonably related to this work injury through and including July 22, 2008. The medical treatment Plaintiff received for his injuries prior to July 22, 2008 was reasonably required to effect a cure, provide relief or less his disability. N.C. Gen. Stat. §§ 97-2(19), 97-25 (2009).
5. Defendant is not entitled to a credit for unemployment benefits received by Plaintiff since his disability ended prior to receipt of unemployment benefits. N.C. Gen. Stat. § 97-42-1 (2009).
6. Defendant had reasonable grounds to defend this claim. N.C. Gen. Stat. § 97-88.1 (2009).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Plaintiff is not entitled to any additional temporary total disability compensation after April 24, 2008.
2. Defendant shall pay all medical expenses incurred as a result of Plaintiff's January 30, 2008 work injury up to July 22, 2008.
3. Defendant shall pay the costs of these proceedings.
This the ___ day of May 2010. *Page 20 
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1